**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**UNITED STATES OF AMERICA**

**v.**

**JORDAN PACK,**

**Defendant.**

**CRIMINAL ACTION NO.
1:23-CR-8-TCB-CCB**

## FINAL REPORT AND RECOMMENDATION

Defendant Jordan Pack is charged with three violations of 18 U.S.C. § 922(g)(1) (Counts 1, 2 & 3). (Doc. 2). Defendant moves to dismiss the indictment, arguing that the charges violate his rights under the Second Amendment. (Doc. 24). He also seeks to suppress cell phone evidence that the Government obtained as a result of his arrest on August 10, 2022, (Doc. 22), and to suppress any post-arrest statements made to law enforcement, (Doc. 23). The Court held an evidentiary hearing on October 26, 2023. (Doc. 29). On January 23, 2024, Defendant filed a post-hearing brief, (Doc. 32), to which the Government responded on March 8, 2024, (Doc. 37). Defendant subsequently filed a reply on March 22, 2024. (Doc. 40). Defendant's motions are now ripe for review, and I will address them in turn.

## I.     Motion to Dismiss the Indictment

Section 922(g)(1) makes it a crime for any person who has been convicted of a crime punishable by imprisonment for a term exceeding one year to, among other things, knowingly possess any firearm or ammunition in or affecting interstate or foreign commerce. 18 U.S.C. § 922(g)(1). Defendant seeks to dismiss all of the counts in the indictment, arguing that following the Supreme Court's decision in *New York State Rifle and Pistol Assoc., Inc. v. Bruen*, 597 U.S. 1 (2022), the charges violate his rights under the Second Amendment. (Doc. 24). More specifically, Defendant argues that the Supreme Court's decision in *Bruen* overruled or undermined a prior Eleventh Circuit decision, *United States v. Rozier*, 598 F.3d 768, 770–71 (11th Cir. 2010), where the court upheld the constitutionality of Section 922(g)(1). *Id.* at 7–14.

Only weeks after Defendant filed his post-hearing brief, the Eleventh Circuit rejected his argument, holding that "[b]ecause the Supreme Court made it clear in [*District of Columbia v. Heller*, 554 U.S. 570 (2008)] that its holding did not cast doubt on felon-in-possession prohibitions, and because the Court made it clear in *Bruen* that its holding was in keeping with *Heller*, *Bruen* could not have clearly abrogated our precedent upholding section 922(g)(1)." *United States v. Dubois*, 94 F.4th 1284, 1293 (11th Cir. 2024) (alterations, citations, and internal quotation marks omitted).

2

And Defendant acknowledges as much in his reply brief, noting that he maintains his motion simply to preserve the issue for further review by the Eleventh Circuit sitting en banc or by the Supreme Court. (Doc. 40 at 4). This Court is bound by *Rozier* and *Dubois*—which uphold the constitutionality of Section 922(g)(1) under the Second Amendment—and, as such, Defendant's motion to dismiss the indictment, (Doc. 24), should be **DENIED**.[1]

## II.    Motion to Suppress Cell Phone Evidence

Defendant moves to suppress the contents of his cellular phone recovered by law enforcement on August 10, 2022. (Doc. 22). In his post-hearing brief, Defendant states that the Government represented that it would not introduce any evidence from the cell phone during its case-in-chief. (Doc. 32 at 1).[2] The Government confirms as much in its brief, and it does not further address the motion on the merits. (Doc. 37 at 2). Defendant does not mention the motion in his reply. (Doc. 40). Given the Government's representation that it will not use

---

[1] Given the Eleventh Circuit's opinion in *Dubois*, I do not address Defendant's arguments to the contrary in any detail. It is enough to simply note that this Court is bound by the Circuit's decision.

[2] Defendant referenced the phone as "Mr. May's," (Doc. 32 at 1); it is clear from the context that this is a typo.

evidence obtained from the cell phone in its case-in-chief, Defendant's motion to suppress, (Doc. 22), should be **DENIED AS MOOT**.

## III.   Motion to Suppress Defendant's Statements to Police

Defendant moves to suppress the statements he made to police during two arrests, the first on October 22, 2021, and the second on August 10, 2022. (Doc. 23;[3] Doc. 32). Defendant argues that his October 22, 2021, statements should be suppressed because they were involuntary and obtained in violation of *Miranda*, (Doc. 32 at 9–11; *see also* Doc. 40 at 1–3), and that his August 10, 2022, statements should be suppressed because they were obtained in violation of *Miranda*, (Doc. 32 at 11–13). As mentioned above, the Court held an evidentiary hearing on October 26, 2023. (Doc. 29). The facts provided below are drawn from several officers' testimony and the exhibits introduced at that hearing. The Court will address Defendant's October 22, 2021, statements and then take up his August 10, 2022, statements.

---

[3] Although in Defendant's initial motion he moved to suppress only his post-arrest statements made to officers and/or federal agents on August 10, 2022, Defendant requested that the Government disclose whether it intended to introduce any other post-arrest statements. (Doc. 23 at 2 n.1). At the evidentiary hearing, defense counsel clarified that she intended for the motion to cover any statements made by Defendant on October 22, 2021, in addition to those he made on August 10, 2022. (Doc. 30 at 5–6).

### A.  October 22, 2021 Statements to the Gwinnett County Police Department

### 1.  Facts

On October 22, 2021, Gwinnett County Police Department Officer Kevin Fieldgrove and Sergeant Christopher Giles responded to an automobile accident in Dacula, Georgia. (Doc. 30 at 51–53).[4] Defendant, who was standing nearby, was a passenger in the vehicle responsible for the collision. *Id.* at 54. When asked for his name by Officer Fieldgrove, Defendant identified himself as William Tate. *Id.* at 56. Defendant gave Officer Fieldgrove two different years of birth, 1989 and 1987. *Id.* at 57. Neither birthdate with the name William Tate returned any results when the officer queried state and national databases. *Id.* at 55–56. As such, Officer Fieldgrove decided to arrest Defendant for giving a false date of birth. *Id.* at 57–58.

Officer Fieldgrove placed Defendant under arrest and handcuffed his hands behind his back. (Gov't Ex. 2-B at 18:42).[5] At the same time, Sergeant Giles removed a backpack that Defendant was wearing. *Id.* at 19:00; *see also* (Doc. 30 at

---

[4] The Court refers to the CM/ECF page numbers located on the upper right-hand corner of the transcript pages.

[5] Government's Exhibit 2 includes two videos: Officer Fieldgrove's body-worn camera footage and Sergeant Giles's body-worn camera footage from October 22, 2021. For clarity, Officer Fieldgrove's footage will be referred to as Gov't Ex. 2-A and Sergeant Giles's footage will be referred to as Gov't Ex. 2-B.

63). Officer Fieldgrove asked Defendant whether he had any weapons on his person while Officer Giles searched the bag. (Gov't Ex. 2-B at 19:01–19:17).

Fieldgrove: Do you have any weapons on you? Mr. Tate, do you have any weapons on you?[6]

Defendant: There's one in the bag.

Fieldgrove: There's one in the bag? What about in your pockets?

Defendant: [unintelligible]

Giles: What kind of weapon is in here?

Defendant: Should be a firearm [unintelligible].

*Id.* Officer Fieldgrove then asked Defendant if he had any knives or needles in his pockets, and he subsequently patted down Defendant for weapons. *Id.* at 19:18–19:24.

While continuing to search the bag, Sergeant Giles asked Defendant whether he was on probation or parole, whether he was Deondra White, and who Deondra White is. *Id.* at 19:36–19:56. Sergeant Giles did not locate a firearm in Defendant's bag. *Id.* at 19:55–20:05. He then asked Defendant, "Where is the

---

6 Defendant concedes that "law enforcement's initial question of whether [Defendant] had any weapons on his person was permissible to ensure officer safety." (Doc. 40 at 2).

firearm at? What did you do with it?" *Id.* at 20:05. Officer Fieldgrove and Sergeant Giles continued to ask Defendant what he did with the firearm and when he last had possession of it. *Id.* at 20:15–22:12. Defendant responded with various explanations, one being that he returned the firearm to its owner, *id* at 20:10–20:18, and another being that he left the firearm at the mall where he works, *id.* at 21:13–21:48.

As to Defendant's demeanor during his interaction with the officers, Sergeant Giles recounted that Defendant "seemed a little slow to respond," (Doc. 30 at 75), and testified that he believed that Defendant was under the influence of a substance, (*id.* at 76). Officer Fieldgrove also testified that Defendant appeared to be under the influence and that an open bottle of alcohol was found in the car that Defendant had been riding in. *Id.* at 57. When asked whether Defendant's speech seemed slurred, Officer Fieldgrove testified that his speech "appeared off" and "was weird." *Id.* at 56. Nonetheless, in Officer Fieldgrove's view, Defendant appeared to be coherent and was capable of answering the questions posed to him. *Id.* at 55.

### 2.   Analysis

Defendant asserts in his pre-hearing "Motion to Suppress Evidence," (Doc. 23), that "any statements made by Mr. Pack were done so involuntarily and

without a knowing waiver of his *Miranda* rights, all in violation of the Fifth Amendment to the United States Constitution." *Id.* at 2. In his post-hearing brief, Defendant refines his argument as to his October 22, 2021, statements by arguing that his statements were obtained in violation of *Miranda* because he was questioned by officers after being formally placed under arrest. (Doc. 32 at 10–11). Defendant also argues that his statements were not voluntarily made because the officers continued to question him all the while knowing that he was intoxicated. *Id.* at 9–10.

The Fifth Amendment requires courts to "exclude from evidence any incriminating statements an individual makes before being warned of his rights to remain silent and to obtain counsel." *United States v. Luna-Encinas*, 603 F.3d 876, 880 (11th Cir. 2010). The entitlement to *Miranda* warnings, however, "attaches only when custodial interrogation begins." *Id.* (internal quotation marks omitted). Interrogation, for purposes of *Miranda*, includes "express questioning" as well as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980) (footnote omitted). "Because the underlying purpose of the *Miranda* rule is to dispel compulsion, the relevant inquiry in deciding whether words or actions constitute interrogation focuses primarily upon the perceptions

8

of the suspect, rather than the intent of the police." *United States v. Hicks*, 546 F. Supp. 2d 1378, 1381 (N.D. Ga. 2008) (internal quotation marks omitted). "The government bears the burden of showing that the defendant's in-custody statements were obtained in compliance with the dictates of *Miranda* and were otherwise voluntary, or whether some exception to the *Miranda* rule applies." *United States v. Chaidez-Reyes*, 996 F. Supp. 2d 1321, 1345 (N.D. Ga. 2014) (internal quotation marks, citations, and footnote omitted).

The parties do not dispute that Defendant was in custody once he was handcuffed by Officer Fieldgrove at the scene of the accident. (Doc. 32 at 10–11; Doc. 37 at 12). The Government likewise does not dispute that the officers did not advise Defendant of his *Miranda* rights before questioning him. (Doc. 32 at 10–11; Doc. 37 at 12). Nonetheless, the Government submits that the officers' questioning did not violate *Miranda* because the *Quarles* public safety exception to the *Miranda* requirement applies. (Doc. 37 at 12). Defendant replies that *Quarles* is not applicable to the facts before the Court because officers "question[ed] Mr. Pack about topics unrelated to the potential firearm" and "exceeded the bounds of the public safety exception." (Doc. 40 at 2–3). Defendant, however, concedes that "law enforcement's initial question of whether he had any weapons on his person was

permissible to ensure officer safety." *Id.* at 2.[7] But he maintains that the rest of the questions and answers were impermissible.

In *New York v. Quarles*, 467 U.S. 649 (1984), police officers were in pursuit of a suspect who they believed was armed with a gun. *Id.* at 652. The victim told police that the suspect had just entered a nearby supermarket. *Id.* The police located him in the store with an empty shoulder holster. *Id.* The officer asked the suspect where the gun was. *Id.* After retrieving the gun on the scene, the officer formally placed the suspect under arrest and read him his *Miranda* rights. *Id.*

The Supreme Court held that in such circumstances, the police were not required to give the defendant *Miranda* warnings before asking about the location of a gun because "overriding considerations of public safety justif[ied] the officer's failure to provide *Miranda* warnings before he asked questions devoted to locating the abandoned weapon." *Id.* at 651. As the Eleventh Circuit has explained, the "public safety exception allows law enforcement officers to question a suspect without first informing him of his *Miranda* rights when they reasonably believe doing so is necessary to protect either the officers or the public." *United States v.*

---

[7] For what it's worth, in *United States v. Freeman*, 591 F. App'x 855, 862 (11th Cir. 2014), the Eleventh Circuit explained that an officer's "questions as to whether Freeman was carrying a weapon were not an 'interrogation' under *Miranda*, because the purpose of the questions was to ensure the officers' safety during Freeman's arrest and not to elicit evidence of a crime."

*Ochoa*, 941 F.3d 1074, 1096–97 (11th Cir. 2019); *see also United States v. Williams*, 784 F. App'x 707, 710 (11th Cir. 2019) (explaining that the officer's "questions as to the location of the firearm were proper to protect himself, his fellow officer, and the other individuals on the scene, and thus fell within the public safety exception" to *Miranda*).

Here, the majority of Officer Fieldgrove and Sergeant Giles's questions to Defendant concerned the firearm that he reported having in his bag. Additionally, Officer Fieldgrove testified that he asked Defendant whether he had any weapons on him to make sure that he didn't "have anything that can be used to harm [himself] or to harm the officers." (Doc. 30 at 59). Sergeant Giles explained that he continued to ask Defendant questions about the firearm because he "wanted to rule out the possibility that that firearm was left in an area where a child could discover it and play with it, and potentially shoot themselves or someone else." *Id.* at 74. Though "the subjective motives of the officers are not to be considered in determining the applicability of the public safety exception," an objective view of the officer's questions leads to the same conclusion—that once Defendant told the officers that he had a gun, which was not where he said it was, the officers had the right to follow up in an effort to locate the weapon. *Williams*, 784 F. App'x at 710.

Defendant informed the officers that he had a firearm in his bag, and after failing to locate it in that bag, they followed up by asking Defendant questions

11

about where it was. Defendant did not provide clear or consistent answers. And because the interaction took place in a residential neighborhood accessible to members of the public, including children, the officers' follow-up "questions [were] reasonably prompted by a concern for the public safety." *Quarles*, 467 U.S. at 656. Accordingly, Defendant's empty bag—empty in the sense that it did not contain the firearm that Defendant claimed was there—can be thought of as the functional equivalent of the empty holster at issue in *Quarles*. *See id.* at 657. "So long as the gun was concealed somewhere in the [vicinity], with its actual whereabouts unknown, it obviously posed more than one danger to the public safety: an accomplice might make use of it, a [neighbor] or [child] might later come upon it." *Id.* Therefore, the officers' questioning of Defendant about the firearm was permissible because "they reasonably believe[d] doing so [was] necessary to protect either the officers or the public." *Ochoa*, 941 F.3d at 1097.

However, the other questions posed by Sergeant Giles referenced by Defendant in his reply, (*see* Doc. 40 at 2),[8] are not covered by the public safety exception because they do not concern the firearm that the officers were looking for. Moreover, the Government does not argue that these questions are covered by

---

[8] Specifically, Sergeant Giles asks Defendant whether he was on probation or parole, whether he was Deondra White, and who Deondra White is. (Gov't Ex. 2-B at 19:36–19:56).

the public safety exception. (*See* Doc. 37 at 14 ("The Defendant's response to questions about the location of the gun, and where the Defendant had seen it, were not obtained in violation of *Miranda*, and should be admitted.")). Therefore, Defendant's statements in response to these questions posed by Sergeant Giles (whether he was on probation or parole, whether he was Deondra White, and who Deondra White is) should be suppressed.

Even though there was no *Miranda* violation with respect to the officers' questions related to the firearm, the Court "still must determine that any confessions or incriminatory statements made by a defendant were voluntary" before those statements can be admitted at trial. *United States v. Lazarus*, 552 F. App'x 892, 895 (11th Cir. 2014). A court looks at the totality of the circumstances when evaluating voluntariness, and the question ultimately is whether the defendant's statement "was the product of an essentially free and unconstrained choice." *Hubbard v. Haley*, 317 F.3d 1245, 1252 (11th Cir. 2003) (internal quotation marks omitted). Among the factors a court should consider "are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police." *Id.* at 1253. A defendant's intoxication is another factor that a court can consider. *Id.* at 1253–54 (concluding that the defendant's statement was freely given even though he had consumed alcohol); *see also United States v. Hall*, 565 F.2d

917, 921 (5th Cir. 1978) (discussing voluntariness of consent to search and noting that "intoxication is a factor to consider, but that fact alone is not sufficient to undermine [the individual's] consent").[9]

"Those cases where courts have found confessions to be involuntary have contained a substantial element of coercive police conduct." *United States v. Patterson*, No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *4 (N.D. Ga. Aug. 10, 2007) (internal quotation marks omitted). "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." *United States v. Thompson*, 422 F.3d 1285, 1295–96 (11th Cir. 2005) (internal quotation marks omitted).

Here, though Defendant was physically restrained in handcuffs and may have been displaying signs of some sort of intoxication during the encounter, I find that his statements were voluntary. The interview was not exhaustingly long, there is no evidence of any threats or application of unnecessary physical force, and there is nothing to suggest any promises were made to induce Defendant's

---

[9] In *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

statements. Furthermore, even assuming that Defendant was intoxicated during the encounter, Officer Fieldgrove testified that he appeared to be coherent and was capable of answering the questions posed to him. (Doc. 30 at 55); *see also United States v. Bertram*, 805 F.2d 1524, 1526–28 (11th Cir. 1986) (upholding finding that the defendant's wife freely gave consent where she had been drinking but the officer testified that she was coherent). And the video evidence bears this out—although Defendant did not always answer the specific questions asked and sometimes gave conflicting responses, he was certainly able to meaningfully engage in the conversation. Under those facts, there is simply no basis to conclude that Defendant's statements were involuntary.

As such, Defendant's statements made to officers at the scene of the car accident on October 22, 2021, in response to questioning about the firearm, should not be suppressed as violative of the Fifth Amendment. *See* Gov't Ex. 2-B at 18:42–19:35; *id.* at 20:04–22:05. However, Defendant's statements in response to the other questions about his probation or parole status or Deondra White, *see id.* at 19:36–19:56, should be suppressed.

**B.      August 10, 2022 Statements to the Atlanta Police Department**

**1.      Facts[10]**

On August 10, 2022, Atlanta Police Department (APD) Officer Anthony Taijeron-John was working with members of the APD Fugitive Unit to locate and arrest Defendant on several outstanding warrants. (Doc. 30 at 11–13). Officer Taijeron-John located a vehicle, which investigators believed Defendant used, parked at 320 Fairburn Road in Atlanta, Georgia. *Id.* APD officers located Defendant, conducted an armed takedown, and placed him in handcuffs. *Id.* at 16–17. Officer Taijeron-John transported Defendant to the APD Public Safety Center.

---

[10] In its factual summary, the Court will discuss the facts most relevant to the statements that the Government intends to admit and that Defendant seeks to suppress. Defendant withdrew his motion with respect to statements he made in the back of the police vehicle to Officer Taijeron-John. (Doc. 32 at 5–6). Defendant does not challenge the statements that he made to APD Investigator Louis Ellison after waiving his *Miranda* rights up until the point where Defendant indicated that he did not want to talk about a particular incident. *Id.* at 8. Moreover, the Government does not intend to admit any of Mr. Pack's statements obtained by officers after this point in the interrogation. *Id.*; *see also* (Doc. 37 at 2). Accordingly, the Court need only assess the statements made to Officer Taijeron-John in the elevator and the interrogation room.

*Id.* at 17–18. Once they arrived, Officer Taijeron-John escorted Defendant from the squad car, on an elevator, and into an interrogation room. (Doc. 30 at 19).

While in the elevator, Defendant initiated a conversation with Officer Taijeron-John:

| | |
|---|---|
| Defendant: | Y'all know you did me a favor, right? |
| Taijeron-John: | Why's that? |
| Defendant: | Because I always thought y'all would come more aggressive than that, like beat me up or [unintelligible].[11] |

(Gov't Ex. 1-A at 2:17:48–2:17:58).[12] After responding, "Nah, not at all," Officer Taijeron-John continued the conversation by asking Defendant questions about what he was thinking during the takedown:

| | |
|---|---|
| Taijeron-John: | Nah, not at all. What were you thinking when we were walking towards you with the rifles though? Why were you walking towards us, huh? |

---

[11] Defendant withdraws his motion to suppress as to these statements but maintains his motion with respect to the subsequent statements he made to Officer Taijeron-John. (Doc. 32 at 7–8).

[12] Government's Exhibit 1 includes two videos: Officer Taijeron-John's body-worn camera footage and the footage from the interrogation room at the APD Public Safety Center. Exhibit 1-A refers to Officer Taijeron-John's footage, whereas Exhibit 1-B refers to the interrogation-room footage.

| | |
|---|---|
| Defendant: | Surviving, bruh. Time ran out. |
| Taijeron-John: | Yeah . . . I can't believe you were here in Georgia this whole time, three, two and a half years on the run . . . Were you tired? |
| Defendant: | Yeah. |
| Taijeron-John: | That shit's exhausting. |
| Defendant: | Yeah. Stressful, you don't have . . . You can't really do nothing. You feel what I'm saying. |

*Id.* at 2:17:58–2:18:27.[13] At this point in the encounter, Officer Taijeron-John directed Defendant to sit down in a chair in the interrogation room and placed leg restraints on his ankles. *Id.* at 2:18:27–2:18:54. The conversation continued.

| | |
|---|---|
| Defendant: | You know something honestly [unintelligible] I could've been ran but I wouldn't have gotten nowhere. |
| Taijeron-John: | Nah, the helicopter was up. |
| Defendant: | I seen that. |
| Taijeron-John: | You heard it? |
| Defendant: | I knew what it was, that's why I was like it ain't even . . . |
| Taijeron-John: | Is that why you went and messed with the |

---

[13]  The Court uses ellipses in the transcript of the body cam audio to indicate pauses in the speech of either speaker, not to indicate omissions.

18

shotgun?[14]

| | |
|---|---|
| Defendant: | Nah, nah, nah. |
| Taijeron-John: | Okay. |
| Defendant: | I use that for my job. |
| Taijeron-John: | Okay, that shit had us worried. That shit had us worried, dude! |
| Defendant: | Oh, nah . . . To tell the truth, when the [unintelligible] came through the gate if it really would have been like . . . go on ahead bro, it's over with, I already seen the helicopter [unintelligible]. |
| Taijeron-John: | Yeah, see the thing is with those warrants, we never know how you're gonna react. |

*Id.* at 2:18:45–2:19:23. The conversation continued for another 45 seconds or so before Officer Taijeron-John left the room to get the investigators. *Id.* at 2:19:24–2:20:17.

---

14 The Government concedes that this question "did elicit an incriminating response and was arguably likely to do so," and does not intend to introduce Defendant's response to this question nor any of the subsequent dialogue between Defendant and Officer Taijeron-John in its case-in-chief. (Doc. 37 at 18 n.6). The Court only provides a few more lines of the conversation for context.

19

### 2.   Analysis

Defendant asserts in his pre-hearing "Motion to Suppress Evidence," (Doc. 23), that "any statements made by Mr. Pack were done so involuntarily and without a knowing waiver of his *Miranda* rights, all in violation of the Fifth Amendment to the United States Constitution." *Id.* at 2. In his post-hearing brief, Defendant narrows his suppression challenge by arguing that his August 22, 2022, statements were obtained as the result of unlawful interrogation prior to being Mirandized. (Doc. 32 at 11–13). The Government concedes that Defendant was in custody at the time of his statements to Officer Taijeron-John but maintains that Defendant was not subject to interrogation. (Doc. 37 at 16–18).

As discussed above, the Fifth Amendment requires courts to "exclude from evidence any incriminating statements an individual makes before being warned of his rights to remain silent and to obtain counsel." *Luna-Encinas*, 603 F.3d at 880. The entitlement to *Miranda* warnings, however, "attaches only when custodial interrogation begins." *Id.* (internal quotation marks omitted). Interrogation, for purposes of *Miranda*, includes "express questioning" as well as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 300–01 (footnote

omitted). "Because the underlying purpose of the *Miranda* rule is to dispel compulsion, the relevant inquiry in deciding whether words or actions constitute interrogation focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Hicks*, 546 F. Supp. 2d at 1381 (internal quotation marks omitted). "The government bears the burden of showing that the defendant's in-custody statements were obtained in compliance with the dictates of *Miranda* and were otherwise voluntary, or whether some exception to the *Miranda* rule applies." *Chaidez-Reyes*, 996 F. Supp. 2d at 1345 (internal quotation marks, citations, and footnote omitted).

The parties agree that the initial conversation between Defendant and Officer Taijeron-John was initiated by Defendant. (Gov't Ex. 1-A at 2:17:48 ("Y'all know you did me a favor, right?")). Moreover, Defendant does not challenge this initial exchange. (Doc. 32 at 7–8). However, the parties disagree as to whether Defendant was subjected to interrogation when Officer Taijeron-John asked, "What were you thinking when we were walking toward you with rifles though? Why were you walking toward us?" (Gov't Ex. 1-A at 2:17:59; *see also* Doc. 32 at 8; Doc. 37 at 17).

Here, these questions posed by Officer Taijeron-John qualify as "express questioning . . . that the police should know [is] reasonably likely to elicit an

incriminating response from the suspect." *Innis*, 446 U.S. at 300–01. However,

when a criminal suspect makes voluntary statements that are ambiguous—such

as Defendant's prior statements[15] in the elevator preceding Officer Taijeron-John's

questions about what Defendant was thinking when he continued to walk towards

the officers—the police may ask clarifying questions without running afoul of

*Miranda* so long as the questions do not appear to be intended to elicit an

incriminating response. *United States v. Villegas-Tello*, 319 F. App'x 871, 875–76

(11th Cir. 2009). This exception to *Miranda* does not apply here, however, because

Officer Taijeron-John's questions do not clarify any ambiguity about Defendant's

preceding statement. Defendant stated, "Because I always thought y'all would

come more aggressive than that, like beat me up or [unintelligible]." (Gov't Ex. 1-

A at 2:17:53). Officer Taijeron-John then responds, asking about Defendant's state

of mind at the time of the armed takedown. *Id.* at 2:17:59. Officer Taijeron-John's

follow-up questions were not "neutral response[s], intended to clarify

[Defendant's] puzzling declaration." *United States v. McRae*, No. CR 119-125, 2020

---

15 For the sake of clarity, those statements are "Y'all know you did me a favor, right?", (Gov't Ex. 1-A at 2:17:48), and "Because I always thought y'all would come more aggressive than that, like beat me up or [unintelligible]," *id.* at 2:17:53.

WL 1891749, at *5 (S.D. Ga. January 23, 2020) (alterations in original) (quoting *Andersen v. Thieret*, 903 F.2d 526, 532 (7th Cir. 1990)).

Similarly, Officer Taijeron-John's next question that "I can't believe you were here in Georgia this whole time, three, two and a half years on the run . . . Were you tired?" (Gov't Ex. 1-A at 2:18:08), also violates *Miranda*. This was not a follow-up to any voluntary, ambiguous statement—it was simply a question posed to a fugitive that could only be designed to elicit an incriminating response. Officer Taijeron-John then directed Defendant to sit down in a chair in the interrogation room and placed leg restraints on his ankles. *Id.* at 2:18:36–2:18:48. Around this time, Defendant and Officer Taijeron-John began discussing the fact that there was a helicopter responding to the scene of the takedown. *Id.* at 2:18:46–2:18:55. Because Officer Taijeron-John's statements and questions during this part of the encounter were also "reasonably likely to elicit an incriminating response from the suspect" *Innis*, 446 U.S. at 301, Defendant continued to be subjected to custodial interrogation, and his statements were obtained in violation of *Miranda*. Defendant's statements should be suppressed because at no point during Defendant's encounter with Officer Taijeron-John at the APD Public Safety

Center[16] was Defendant free from the "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda v. Arizona*, 384 U.S. 436, 467 (1966).

As such, Defendant's statements subsequent to Officer Taijeron-John's questions about what Defendant was thinking at the time of the takedown at 320 Fairburn Road should be suppressed as violative of *Miranda*. (*See* Gov't Ex. 1-A at 2:17:59–2:18:55).

## IV.   Conclusion

In sum, I **RECOMMEND** that Defendant's motion to dismiss the indictment, (Doc. 24), be **DENIED**; that Defendant's motion to suppress cell phone evidence, (Doc. 22), be **DENIED AS MOOT**; and that Defendant's motion to suppress Defendant's statements, (Doc. 23), be **DENIED** as to the October 22, 2021,

---

[16] To be clear, the Court only refers to roughly one minute of the interaction disputed by the parties—namely, timestamp 2:17:59 through 2:18:55 of Government Exhibit 1-A. The Court need not address the conversation up to Officer Taijeron-John's response of "Nah, not at all," (Gov't Ex. 1-A at 2:17:58), because Defendant does not challenge this portion of the conversation as violative of *Miranda*. And as to the conversation that follows Officer Taijeron-John's question, "Is that why you went and messed with the shotgun?," *id.* at 2:18:55, the Government does not intend to offer Defendant's response or any part of the subsequent conversation in its case-in-chief.

questioning about the firearm **and GRANTED** as to the October 21, 2022, questioning unrelated to the firearm and as to the contested portions of Officer Taijeron-John's questioning of Defendant at the APD Public Safety Center. There are no other pretrial matters pending before the undersigned, and this case is **CERTIFIED READY FOR TRIAL**.

**IT IS SO RECOMMENDED,** this 26th day of April, 2024.

_____
CHRISTOPHER C. BLY
UNITED STATES MAGISTRATE JUDGE

25